**E-FILED**
Wednesday, 08 August, 2007  05:55:49 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

---

Turkey Scope, LLC                                    Civil File No. 06-1282

       Plaintiff,

v.

Jennie-O Turkey Store, Inc.,

       Defendant.

---

## JENNIE-O'S INITIAL CLAIM CONSTRUCTION BRIEF

---

## I.  INTRODUCTION

Jennie-O Turkey Store, Inc. ("Jennie-O") submits this brief in preparation for the Court's Markman Hearing scheduled on September 5, 2007.  The parties dispute the meaning of certain terms in the '234 Patent, and Jennie-O requests construction of such claims.   Jennie-O summarizes the meaning of the claim terms, properly construed, on page 3.

## II.  BACKGROUND ON THE TECHNOLOGY

Turkey loaders, such as those at issue in this lawsuit, transport turkeys from barns in which they are raised into coops located on semi-truck trailers, usually by means of one or more conveyor belts.  The loaded coops are then typically transported to processing plants.

When the turkeys reach the plant, they are unloaded for processing.  Certain systems, including Turkey Scope's patented turkey loader/unloader, are capable of unloading turkeys by simply reversing the direction of the conveyor belts.  Others, including the accused Jennie-O turkey loader, are not.

1

### III.     PROCEDURAL HISTORY

On November 7, 2006, Turkey Scope sued Jennie-O, alleging infringement of U.S. Patent No. 6,447,234 ("the '234 Patent"), titled "Livestock Loading/Unloading System" ('234 Patent, Ex. A to Declaration of Kurt J. Niederluecke in Support of Jennie-O's Motion for Summary Judgment and Initial Claim Construction Brief dated August 8, 2007 (hereafter "Niederluecke Decl.")).  The '234 Patent issued on September 10, 2002, from an application filed on March 26, 1999, as a continuation-in-part of an application filed on February 21, 1997.  (*Id.*)  As its title indicates, the '234 Patent is directed to a system for loading and unloading livestock.  (*Id.*)

According to the Joint Rule 26(f) Report, the parties exchanged infringement claim charts.  (Exs. B & S to Niederluecke Decl.)  Turkey Scope accused one turkey loader in use at Evergreen Farms in Wisconsin (the "Accused Loader") of infringing claims 1 and 6 of the '234 Patent.[1]  (Ex. B to Niederluecke Decl.)  Jennie-O to responded that the Accused Loader was missing the following bolded limitations:

> **1. A livestock loading/unloading system for loading/unloading livestock from a transport vehicle, the vehicle having two sides and a width extending from one side to the other, the system comprising:**
> a storage unit for the storage of livestock during transport, said unit supported by the vehicle and being generally rectangular with a top, a bottom, two sides and two open ends, said sides generally extending said width of said vehicle and each of said ends including a door;
> a base having a first and a second end;
> a conveying mainframe having a first and a second end, said first end of said mainframe pivotally attached near said first end of said base;
> **a telescopic conveying belt section having a conveyor belt and further having a first end and a second end, said first end of said telescopic conveying belt section pivotally attached to said second end of said mainframe, said second end of said telescopic conveying belt section generally capable of extending and retracting said belt from one end of said unit to the other; and**
> **an elevating support member having one end attached near said second end of said base and another end attached near said second**

---

[1] Jennie-O owns 15 additional loaders that are materially identical to the Accused Loader.

**end of said mainframe whereby said elevating support member is capable of raising/lowering said mainframe.**

(Ex. S to Niederluecke Decl.)

Based on their infringement charts, the parties identified eight terms in dispute, needing further construction by the Court.  [Dckt. No. 18.]  Based on the intrinsic evidence—the claims, the specification, and the prosecution history of the '234 Patent—Jennie-O respectfully submits that the proper constructions of those disputed terms are as follows:

| Claim Term | Construction |
| --- | --- |
| "livestock loading/unloading system" | a system capable of loading and unloading livestock, including poultry, to and from a transport vehicle |
| "loading/unloading" | loading and unloading |
| "conveying mainframe" | the main body of the loading/unloading system that conveys the livestock between the first end of the base and the telescopic conveying belt section |
| "telescopic conveying belt section" | A section containing a telescopic conveying belt.  A telescopic conveying belt is a conveying belt in which the length of the conveying surface can be adjusted. |
| "conveyor belt" | a telescopic conveying belt in which the length of the conveying surface can be adjusted |
| "elevating support member" | a mast supporting ball screws |
| "attached near said second end of said mainframe" | attached to a portion of the mainframe near its second end |
| "capable of raising/lowering said mainframe" | capable of directly raising and lowering the mainframe |

### IV.    ARGUMENT

*A.    **Principles of Claim Construction.***

1.    **Generally.**

In *Phillips v. AWH Corp.*, the Federal Circuit made clear that the most probative evidence of the meaning of a patent claim term is found in the intrinsic record—the claims themselves, the specification, and the prosecution history.  415 F.3d 1303, 1312-17 (Fed. Cir. 2005) (en banc) (reaffirming its previous claim construction holdings in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996); *Vitronics Corp. v. Conceptronics Inc.*, 90 F.3d 1576 (Fed. Cir. 1996); and *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004)).  Extrinsic evidence, such as dictionaries and treatises, may be considered in some circumstances, but is generally disfavored as a means of interpreting claim terms.  *See id.* at 1317-19.

2.    **The Claim Language Defines the Metes and Bounds of the Invention.**

Claim construction analysis begins with the words of the claim.  *Phillips*, 415 F.3d at 1312 ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."); *see also Vitronics*, 90 F.3d at 1582 ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention"). "Because the patentee is required to define precisely what his invention is . . . it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms."  *Phillips*, 415 F.3d at 1312 (internal quotations omitted)

3.    **Claim Terms Should Generally Be Given Their Ordinary and Customary Meaning.**

"[T]he words of a claim are generally given their ordinary and customary meaning"—that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the

time of the invention." *Phillips*, 415 F.3d at 1312-13 (citations omitted).  A person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the other claims and the specification. *Id.* at 1313.  The rationale is that if one skilled in the art were to attempt to interpret the meaning of a claim term, he or she would consult these sources, along with the prosecution history. *Id.*

### 4. Different Claim Terms Should Not Be Construed to Have the Same Meaning.

Two different terms in a claim should not be construed to have the same meaning. *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006); *Applied Med. Res. Corp., v. United States Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) (noting that "the use of two terms in a claim requires that they connote different meanings"); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  Giving two terms the same meaning would render one of them superfluous. *Primos*, 451 F.3d at 848 ("[T]he terms 'engaging' and 'sealing' are both expressly recited in the claim and therefore 'engaging' cannot mean the same thing as 'sealing'; if it did, one of the terms would be superfluous").

### 5. Claim Preambles Are Limiting in Some Circumstances.

The preamble of most patent claims, including Turkey Scope's asserted claims, "consist[s] of everything in the claim preceding the word 'comprising.'" *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 949 (Fed. Cir. 2006).  Generally, "a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)).  However, "a preamble generally limits the claimed invention if it 'recites

5

essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim.'"

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1305 (Fed. Cir. 2005) (quoting *Catalina*

*Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)).

      If the preamble "'helps to determine the scope of the patent claim, then it is construed as

part of the claimed invention.'"  *NTP*, 418 F.3d at 1305 (quoting *Bell Communications Research,*

*Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995)).  "When limitations in

the body of the claim rely upon and derive antecedent basis from the preamble, then the

preamble may act as a necessary component of the claimed invention."  *Eaton Corp. v. Rockwell*

*Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).

      **6.**     **The Claims Must Be Read in View of the Specification.**

      "The claims, of course, do not stand alone"; rather they "must be read in view of the

specification, of which they are a part."  *Phillips*, 415 F.3d at 1315 (citing *Markman*, 52 F.3d at

978).  "[T]he specification is 'highly relevant to the claim construction analysis.  Usually, it is

dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* (quoting *Vitronics*,

90 F.3d at 1582).  The court added:

> Consistent with that principle, our cases recognize that the specification
> may reveal a special definition given to a claim term by the patentee that
> differs from the meaning it would otherwise possess.  In such cases, the
> inventor's lexicography governs.  In other cases, the specification may
> reveal an intentional disclaimer, or disavowal, of claim scope by the
> inventor.  In that instance as well, the inventor has dictated the correct
> claim scope, and the inventor's intention, as expressed in the specification,
> is regarded as dispositive.

*Id.* at 1316 (citations omitted).  When a patent's specification discloses only one embodiment of

the claimed invention, the claims are more likely to be limited to that embodiment.  *Honeywell*

*Int'l, Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (stating that the relevant

feature was "not a preferred embodiment, but an only embodiment"); *see also Laitram Corp. v.*

*Morehouse Indus., Inc.*, 143 F.3d 1456, 1463 (Fed. Cir. 1998) (emphasizing that "nothing in the written description suggests" anything other than the lone disclosed embodiment).

**7.    The Prosecution History Also Guides Claim Construction.**

In addition to consulting the specification, a court "should also consider the patent's prosecution history." *Phillips*, 415 F.3d at 1317 (citing *Markman*, 52 F.3d at 980).  The prosecution history "consists of the complete record of the proceedings before the [U.S. Patent Office]." *Id.*  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*. at 1317 (citations omitted).  The prosecution history will limit the meaning of claim terms "so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc., v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995); *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." (internal quotations omitted)).

**8.    Statements in the Intrinsic Record About "The Invention" Are Limiting.**

When a patentee characterizes the "the present invention" in the specification or the prosecution history, the claims are limited to that characterization.  *Honeywell*, 452 F.3d at 1318; *see also Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998) (relying on the prosecution history's "global comments made to distinguish the applicants' 'claimed invention' from the prior art").  When the patentee states that "the invention" has a certain feature, "[t]he public is entitled to take the patentee at his word." *Honeywell*, 452 F.3d at 1318.

**B.**     ***The Proper Construction of the Disputed Claim Terms.***

**1.      Claims 1 and 6 Require a Telescopic Conveying Belt.**

Based on two terms, claims 1 and 6 require a telescopic conveying belt—i.e., one in which the length of the conveying surface can be adjusted.  The relevant limitation is as follows, with the two terms in bold:

> a **telescopic conveying belt section** having **a conveyor belt** and further having a first end and a second end, said first end of said telescopic conveying belt section pivotably attached to said second end of said mainframe, said second end of said telescopic conveying belt section generally capable of extending and retracting said belt from one end of said unit to the other

The term "telescopic conveying belt section" means a section containing a telescopic conveying belt.  The term "conveyor belt" means a telescopic conveying belt, or a belt in which the length of the conveying surface can be adjusted.  These constructions are clear from the ordinary meaning of the terms used in the '234 Patent and are even more apparent in light of the prosecution history.

**a.      Claim 1 Requires That the Belt Telescope, Not the Section.**

Apart from the abundant evidence in the specification and prosecution history of the '234 Patent, the claim language plainly requires the belt itself to extend and retract, i.e., to telescope.  Highlighting the pertinent limitation of claim 1 demonstrates this telescopic conveying belt requirement:

> a telescopic conveying belt section having a conveyor belt and further having a first end and a second end, said first end of said telescopic conveying belt section pivotably attached to said second end of said mainframe, **said second end of said telescopic conveying belt section generally capable of *extending and retracting said belt*** from one end of said unit to the other

This language shows that ***the belt*** must be capable of extending and retracting, not the section as a whole.  In other words, a "telescopic conveying belt section" is a section having a telescopic

conveying belt, not merely a telescopic section having any kind of conveying belt.  Accordingly, based on the claim language, the conveyor belt must be telescopic.

      **b.**    **The '234 Patent's Specification Reinforces the Claims' Requirement That the "Telescopic Conveying Belt Section" and "Conveyor Belt" Comprise a Telescopic Conveying Belt.**

Lest there be any doubt from the plain language of the claim, the '234 Patent's specification reinforces that claims 1 and 6 require a telescopic conveying belt.  The '234 Patent describes only one embodiment of the claimed livestock loading/unloading system,[2] a system having belts with conveying surfaces that can be lengthened and shortened.  (Ex. A to Niederluecke Decl., col. 9, l. 52 to col. 10, l. 13.)  The system disclosed in the '234 Patent is shown generally in Figure 10a:



The system's head section 148 (highlighted) corresponds directly to the claimed "telescopic conveying belt section," extending into and retracting out of coops.  (*Id.*, col. 11, ll. 44-48.)

---

[2] The '234 Patent actually describes two livestock loading/unloading system embodiments: one in connection with Figures 1-8 and the other in connection with Figures 9-16.  But, during prosecution, the Examiner required Turkey Scope to elect one of those two embodiments because they constituted patentably distinct species of the claimed invention.  (June 28, 2000 Office Action, Ex. C to Niederluecke Decl., p. 2.)  Turkey Scope elected to prosecute claims directed only to the embodiment of Figures 9-16.  (July 13, 2000 Response to Restriction Requirement and Election of Species, Ex. D to Niederluecke Decl., p.1.)  Accordingly, the embodiment of Figures 1-8 bears no relation to the asserted claims.

As shown in Figure 12 of the '234 Patent, the head section (highlighted) includes a head section belt 152 and a primary index 160:



The head section belt 152 itself is not elastic, so it does not change length.  Rather, the primary index 160 lengthens and shortens the conveying surface of the head section belt 152—i.e., the surface on which livestock are conveyed.  (*Id.*, col. 9, l. 52 to col. 10, l. 13.)

The primary index 160 works by adjusting the length of the head section belt 152 that is folded over itself.  (*Id.*)  The portion of the head section belt 152 that is folded over itself is circled in the following figure:



The primary index 160 lengthens the conveying surface by decreasing the length of the head section belt 152 that is folded over itself.  (*Id.*)  Conversely, the primary index 160 shortens the conveying surface by increasing the length of the head section belt 152 that is folded over itself. (*Id.*)  In this way, the primary index 160 telescopes the head section belt 152.

The '234 Patent fails to disclose any configuration showing the "telescopic conveying belt section" extending or retracting through means other than a telescopic conveyor belt.  Thus, the "telescopic conveying belt section" must comprise a "conveyor belt" that itself telescopes, i.e., a belt in which the conveying surface's length can be adjusted.

### c.     Turkey Scope Repeatedly Defined Its Invention as Including a Telescopic Conveying Belt to Secure the '234 Patent.

In order to distinguish its invention from the prior art, and to obtain the '234 Patent, Turkey Scope during prosecution amended its claims and clearly defined "telescopic conveying belt section" and "conveyor belt" to require a telescopic conveying belt.  Responding to three rounds of rejections by the Patent Office, Turkey Scope repeatedly attempted to distinguish over Jennie-O's own prior art patent by emphasizing its invention's telescopic conveying belt.  In doing so, Turkey Scope disclaimed loaders that do not have a telescopic conveying belt.

Beginning with the first exchange between Turkey Scope and the Patent Office, Turkey Scope extolled its invention's telescopic conveying belt.  The Patent Office first rejected Turkey Scope's claims because, among other reasons, they were anticipated and rendered obvious by Jennie-O's prior art patent ("the Fitzsimmons Patent").  (Aug. 29, 2000 Office Action, Ex. E to Niederluecke Decl., pp. 6-8.)  The Fitzsimmons Patent disclosed a turkey loader with a telescopic loading box (including a conveying belt) that extended into and retracted from the coops.  (Ex. T to Niederluecke Decl.)

The following figures from the Fitzsimmons Patent illustrate its disclosed system:





Figure 1 show a side profile of the Fitzsimmons Patent's system, and Figures 4 and 8

respectively show its loading box in retracted and extended positions.  (*Id.*)

Turkey Scope responded to the Patent Office's rejection by distinguishing the telescopic

loading box of the Fitzsimmons patent, stating, "By contrast, applicant's system incorporates a

***telescoping belt*** into the coops to load and unload livestock."  (Nov. 7, 2000 Amendment, Ex. F

to Niederluecke Decl., p. 8 (emphasis added).)  Turkey Scope went on to explain,

> In the case of loading livestock, livestock is conveyed from a confinement
> area to a uniquely designed coop via a ***telescoping belt design*** within its
> mainframe and head sections.  The enlarged single coop of the present
> invention allows the complete loading/unloading procedure to occur from
> one side of the vehicle as the ***telescoping belt*** is capable of extending this
> distance.

(*Id.* at pp. 8-9 (emphases added).)

Turkey Scope's attempt to distinguish its claimed invention from the Fitzsimmons Patent

failed, and the Patent Office again rejected all of Turkey Scope's claims.  (Jan. 25, 2001 Office

Action, Ex. G to Niederluecke Decl.)  While acknowledging Turkey Scope's distinction between

a telescopic belt and the Fitzsimmons Patent's telescopic loading box, the Patent Office

explained that the then-pending claim language encompassed both.  (*Id.*, p. 5.)  It stated, "The

term 'telescopic' does not define over [the Fitzsimmons Patent] because *it does not necessarily require that the conveyor belt per se is telescopic.*"  (*Id.* (emphasis added).)

In response, Turkey Scope amended its claims and further argued that its telescopic conveying belt distinguished over the telescopic loading box of the Fitzsimmons Patent.  Turkey Scope amended the relevant limitation of claim 1 as follows:

> a [conveying] telescopic <u>conveying belt</u> section having a first end and a second end, said first end of said telescopic <u>conveying belt</u> section pivotably attached to said second end of said mainframe, said second end of said telescopic <u>conveying belt</u> section generally extendable and retractable from one end of said unit to the other.

(Mar. 23, 2001 Amendment, Ex. H to Niederluecke Decl., Amended Claims attachment claim 31 (emphases in original)[3].)  Turkey Scope argued:

> [T]he batch fill apparatus of Fitzsimmons is not a telescopic belting system.  *The loading box is being telescoped in the compartment and animals conveyed from the box, the conveyor on the floor of the loading box is not of a telescoping configuration.*
>
> By contrast, and according to the present amendment of claims 31 and 49, *applicant's system incorporates a telescoping belt into the coops to load and unload livestock.*

(*Id.*, pp. 2-3 (emphases added)[4].)

The Patent Office still was not persuaded, and rejected Turkey Scope's claims for a third time based on Jennie-O's Fitzsimmons Patent:

> [A]s indicated previously, the claims, even as amended, still do not necessarily require the conveyor belt per se to actually telescope.  They simply require a telescopic conveying section or means which comprises a belt.

---

[3] According to Patent Office convention, language added by amendment is shown by underlining and language removed by amendment is shown in brackets.  (Niederluecke Decl., ¶12.)

[4] Before issuing the '234 Patent, the Patent Office re-numbered the allowed claims per standard Patent Office procedure.  The claim that was examined as claim 31 was re-numbered claim 1, and the claim that was examined as claim 49 was re-numbered claim 11.  (Niederluecke Decl., ¶7.)

(Dec. 17, 2001 Office Action, Ex I to Niederluecke Decl., p. 6.)

In response to the Patent Office's third rejection, Turkey Scope  conceded this point and amended its claims once again, explaining "***By the present amendment, applicant has amended claims 31 and 49 to particularly describe <u>the telescopic nature of the conveyor belt</u>.***"  (Mar. 18, 2002 Amendment, Ex. J to Niederluecke Decl., p. 2 (emphasis added)[5].)  Turkey Scope amended the relevant limitation as follows:

> a telescopic conveying belt section having <u>a conveyor belt and further having</u> a first end and a second end, said first end of said telescopic conveying belt section pivotably attached to said second end of said mainframe, said second end of said telescopic conveying belt section generally <u>capable of</u> extend[able]ing and retract[able]ing <u>said belt</u> from one end of said unit to the other.

(*Id.*, p. 5 (emphases in original)[6].)  Thus, Turkey Scope's claim now explicitly required the belt itself to telescope, not simply the conveying section.  Turkey Scope once again distinguished the Fitzsimmons Patent, stating,

> Fitzsimmons is a batch fill system utilizing a box telescoped into the compartment with a simple conveyor belt that deposits turkeys.  ***The belt is not a telescopic belt design.***

(*Id.*, p. 3 (emphasis added).)

Finally, after three rounds of rejections, Turkey Scope's repeated representations to the Patent Office that its invention requires the belt itself to telescope, and repeated amendments to its claims incorporating that limitation, the Patent Office allowed the '234 Patent.

After Turkey Scope's numerous representations to the contrary, claims 1 and 6 of the '234 Patent cannot now be construed to cover conveyor belts that do not telescope.  "The purpose of consulting the prosecution history in construing a claim is to exclude any

---

[5] *See supra* footnote 4.

[6] *See supra* footnote 3.

interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (internal quotations omitted).  Turkey Scope's numerous amendments and arguments disclaimed systems with only non-telescopic conveying belts.  The Court should thus construe the "telescopic conveying belt section" and "conveyor belt" limitations to exclude such systems, and require a telescopic conveyor belt.

Accordingly, based on the '234 Patent's intrinsic evidence:

- *"telescopic conveying belt section" means a section containing a telescopic conveying belt, which is a conveying belt in which the length of the conveying surface can be adjusted; and*

- *"conveyor belt" means a telescopic conveying belt in which the length of the conveying surface can be adjusted.*

## 2.     The System of Claims 1 and 6 Must Be Capable of Loading and Unloading Livestock.

Claims 1 and 6 of the '234 Patent require that the system be capable of both loading *and unloading* livestock.  The relevant claim limitation, with the terms in bold, is:

> A **livestock loading/unloading system** for **loading/unloading** livestock from a transport vehicle, the vehicle having two sides and a width extending from one side to the other, the system comprising:

The term "livestock loading/unloading system" means a system capable of loading and unloading livestock, including poultry, to and from a transport vehicle.  The term "loading/unloading" means loading and unloading.  Based on these terms, a system that only loads or only unloads, but not both, does not fall within the scope of claims 1 or 6.

### a.     The Preamble of Claim 1 Is Limiting.

Even though "livestock loading/unloading system" and "loading/unloading" appear in the preamble of claim 1, they are limitations.  "[A] preamble generally limits the claimed invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1305 (Fed. Cir. 2005)

(internal quotations omitted).  Additionally, "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."  *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).

The phrase "livestock *loading/unloading* system for *loading/unloading* livestock" goes beyond merely stating the system's intended use; it is necessary to give "life, meaning, and vitality" to claim 1.  The phrase "for loading/unloading livestock" may state the system's intended use, but "livestock loading/unloading system" describes *the kind of system it is*. Finding that both "livestock loading/unloading system" and "for loading/unloading livestock" state the system's intended use would improperly give two terms the same meaning, which would render one of them superfluous.  *Primos*, 451 F.3d at 848.  Thus, because the term "livestock loading/unloading system" describes what kind of system is claimed rather than merely stating the claimed system's intended use, that term is necessary to give life, meaning, and vitality to claim 1.  Accordingly, claim 1's preamble is limiting.

Moreover, claim 1's preamble also recites essential structure and provides antecedent basis for limitations in the body of the claim.  The relevant portion of claim 1, with the key terms in bold, is as follows:

> A livestock loading/unloading system for loading/unloading livestock from **a transport vehicle**, the vehicle having two sides and **a width extending from one side to the other**, the system comprising:
> a storage unit for the storage of livestock during transport, **said unit supported by the vehicle** and being generally rectangular with a top, a bottom, two sides and two open ends, **said sides generally extending said width of said vehicle** and each of said ends including a door;

As can be seen, two limitations from the body of the claim—"said unit supported by *the vehicle*" and "said sides generally extending *said width of said vehicle*"—rely upon and derive antecedent

basis from the preamble.  Specifically, the term "the vehicle" in "said unit supported by the vehicle" refers to the preamble's "a transport vehicle."  Likewise, the term "said width of said vehicle" in "said sides generally extending said width of said vehicle" refers to the preamble's "a width extending from one side to the other."  Accordingly, claim 1's preamble is limiting because it recites essential structure and provides antecedent basis for limitations in the body of the claim.

### b.    The Claim Language Requires that the System Be Capable of Unloading Livestock from a Transport Vehicle.

The language of claim 1 itself not only establishes that the two disputed terms are limitations, it also establishes that the system must be capable of unloading from the transport vehicle.  As demonstrated above, "livestock loading/unloading system" describes the claimed system.  Common sense dictates that a "livestock loading/unloading system" is one that is capable of both loading livestock and unloading livestock.  *Cf. Optical Coating Lab., Inc. v. Applied Vision, Ltd.*, No. C-92-2689 MHP, 1996 WL 53631, at *7-8 (N.D. Cal. Jan. 19, 1996) (interpreting "linear/planar" to mean linear and planar).

Moreover, a key phrase of claim 1's preamble, shown in bold below, confirms Jennie-O's common sense interpretation:

> A livestock loading/unloading system for loading/unloading livestock **from a transport vehicle**, the vehicle having two sides and a width extending from one side to the other, the system comprising:

The claim language recites transporting livestock **from** a transport vehicle, which clearly envisions unloading the livestock.  The claim language mentions nothing about transporting livestock **into** a transport vehicle.  Thus, the claimed system must be capable of at least unloading livestock.  Accordingly, based on the claim language, the Court should construe loading/unloading as requiring the capability to both load and unload.

17

### c.    The '234 Patent's Specification Reinforces the Loading and Unloading Requirement.

The '234 Patent's specification further reinforces that the claimed system must be capable of loading and unloading.  The '234 Patent describes only one embodiment of the claimed livestock loading/unloading system,[7] a system capable of both loading and unloading livestock.  (Ex. A to Niederluecke Decl., col. 8, ll. 28-54.)  The specification describes how that embodiment's conveyor belts run in the forward direction for loading and in the reverse direction for unloading.  (*Id.*, col. 8, ll. 29-34.)  In fact, the specification goes as far as explaining how "the present invention" is capable of unloading livestock:

> *[T]he present invention* can unload livestock in case the apparatus and trailer is full by reversing the belts and conveying the livestock into the barn or the like.

(*Id.*, col. 8, ll. 49-51 (emphasis added).)  Because Turkey Scope has described its only embodiment and "the present invention" as having unloading capability, Jennie-O and the Court are entitled to take Turkey Scope at its word.  *Honeywell*, 452 F.3d at 1318 (stating that when a patentee states that "the present invention" has a certain feature, "[t]he public is entitled to take the patentee at his word").

Moreover, the '234 Patent includes several instances in which the "/" punctuation means capable of doing both.  For example, in the '234 Patent, "extending/retracting" means capable of both extending and retracting (Ex. A to Niederluecke Decl., col. 3, l. 35), "attaching/detaching" means capable of both attaching and detaching (*id.*, col. 7, l. 43), and "raising/lowering" means capable of both raising and lowering (*id.*, col. 14, l. 33).  In each case, Turkey Scope used "/" to indicate the capability to perform both actions.  Thus, the disputed terms should be construed

---

[7] *See supra* footnote 2.

consistent with the one and only embodiment of the '234 Patent to require the capability of both loading and unloading livestock.

### d. During Prosecution, Turkey Scope Reinforced That Its System Both Loads and Unloads.

To the extent that any doubt concerning the proper construction of these disputed terms remains after reviewing the claim language and the specification, the '234 Patent's prosecution history resolves it. In its arguments supporting its application, Turkey Scope twice represented that its claimed system was capable of both loading and unloading livestock. By these representations, Turkey Scope disclaimed systems that cannot unload livestock.

After two rejections by the Patent Office, Turkey Scope amended its claims and argued, "[A]ccording to the present amendment of claims 31 and 49, applicant's system incorporates a telescoping belt into the coops to *load and unload* livestock." (Mar. 23, 2001 Amendment, Ex. H to Niederluecke Decl., p. 3 (emphasis added)[8].) In other words, Turkey Scope represented to the Patent Office that the claimed "livestock loading/unloading system" was capable of loading and unloading livestock.

Moreover, after the Patent Office rejected its claims a third time, Turkey Scope argued that, unlike prior art systems, which could only load livestock, its claimed system could both load and unload. Specifically, Turkey Scope stated:

> The present invention incorporates a unique <u>system</u> which utilizes a novel coop design for the loading/unloading of livestock to/from a single side of a transport vehicle. Applicant respectfully submits that the [prior art] references merely disclose <u>loading apparatus</u> [sic] and do not show or suggest the combined apparatus and coop design <u>system</u> of the present invention.

---

[8] *See supra* footnote 4.

(Mar. 18, 2002 Amendment, Ex. J to Niederluecke Decl., p. 3 (emphases in original).)  By emphasizing that the prior art "merely disclose[d] loading apparatus [sic]," while its claimed system was designed "for the loading/unloading of livestock," Turkey Scope once again represented to the Patent Office that the claimed "livestock loading/unloading system" was different from the prior art because it was capable of loading and unloading livestock.

After Turkey Scope represented that its claimed system was capable of both loading and unloading livestock, claims 1 and 6 of the '234 Patent cannot now be construed to cover systems that cannot unload livestock.  Again, "[t]he purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (internal quotations omitted). By its representations in the '234 Patent's prosecution history, Turkey Scope disclaimed systems that cannot unload livestock.  Thus, the Court should construe the "livestock loading/unloading system for loading/unloading livestock" limitation to exclude such systems.

Accordingly, based on the '234 Patent's intrinsic evidence:

- *"livestock loading/unloading system" means a system capable of loading and unloading livestock, including poultry, to and from a transport vehicle; and*

- *"loading/unloading" means loading and unloading.*

**3.      "Elevating Support Member" of Claims 1 and 6 Requires a "Mast Supporting Ball Screws."**

Claims 1 and 6 of the '234 Patent require the conveying mainframe of the claimed system to be raised and lowered by a particular kind of mechanism: a mast supporting ball screws.  The relevant limitation is as follows:

> an **elevating support member** having one end attached near said second end of said base and another end attached near said second end of said mainframe whereby said elevating support member is capable of raising/lowering said mainframe.

The '234 Patent's specification uses the term "elevating support" interchangeably with a mast supporting ball screws, the mast being powered by a hydraulic motor:

> An elevating support *or mast 110 supporting ball screws* is located toward the front end of the undercarriage 100 and is primarily used to raise and lower the mainframe (136) and head section (148) via a hydraulic motor.

(Ex. A to Niederluecke Decl., col. 7, ll. 26-30 (emphasis added).)  Thus, the "elevating support" is synonymous with the mast supporting ball screws.

Moreover, the '234 Patent describes no other mechanisms for raising and lowering the mainframe in connection with its only embodiment of the claimed system.[9]  Thus, the mast supporting ball screws is "not a preferred embodiment, but an only embodiment."  *Honeywell*, 452 F.3d at 1318.

Accordingly, based on the '234 Patent's intrinsic evidence:

- *"elevating support member" means a mast supporting ball screws.*

**4.      The "Elevating Support Member" of Claims 1 and 6 Must Be Attached to a Portion of the Mainframe Near Its Second End.**

Additionally, claims 1 and 6 of the '234 Patent require the elevating support member to be attached to a portion of the mainframe near its second end.  The relevant limitation is as follows:

> a telescopic conveying belt section having a conveyor belt and further having a first end and a second end, said first end of said telescopic conveying belt section pivotably attached to said second end of said mainframe, said second end of said telescopic conveying belt section generally capable of extending and retracting said belt from one end of said unit to the other; and
> **an elevating support member** having one end attached near said second end of said base and another end **attached near said second end of said mainframe** whereby said elevating support member is capable of raising/lowering said mainframe.

---

[9] *See supra* footnote 2.

The attachment of  the elevating support member "near" the second end of the mainframe contrasts with the telescopic conveying belt section being attached "to" the second end of the mainframe.  According to the plain meaning of these limitations, both the elevating support member and the telescopic conveying belt section must be attached to the mainframe.  The difference is that the telescopic conveying belt section must be attached to the mainframe at the second end, while the elevating support member need only be attached near the second end.

Accordingly, based on the '234 Patent's intrinsic evidence:

- *"attached near said second end of said mainframe" means attached to a portion of the mainframe near its second end.*

### 5.    The "Elevating Support Member" of Claims 1 and 6 Must Be Capable of Directly Raising and Lowering the Mainframe.

Furthermore, claims 1 and 6 of the '234 Patent require the elevating support member to be capable of *directly* raising and lowering the mainframe.  The relevant limitation is as follows:

> an elevating support member having one end attached near said second end of said base and another end attached near said second end of said mainframe whereby said elevating support member is **capable of raising/lowering said mainframe**.

This language implies that the elevating support member is capable of doing something to the mainframe that causes it to raise or lower—i.e., the elevating support member directly raises and lowers the mainframe.  The direct nature of the support is evidenced by its attachment to the mainframe "near said second end."  (*See supra* at Section IV.B.4.)  Had Turkey Scope intended to cover systems in which the elevating support member indirectly raised the mainframe, it would have used language such as:

> *whereby said elevating support member is capable of causing said mainframe to be raised/lowered*

Without such causal language, the plain meaning of "capable of raising/lowering said mainframe" requires that the elevating support member be capable of directly raising and lowering the mainframe.

This construction is consistent with the only embodiment of the claimed system disclosed in the '234 Patent.[10]  FIG. 10c illustrates how, in that embodiment, the mast (i.e., the "elevating support member") applies force directly to the mainframe, thereby causing the mainframe to raise and lower:



(*See also* Ex. A to Niederluecke Decl., col. 7, ll. 26-30.)  Thus, the '234 Patent's only embodiment of the claimed system confirms Jennie-O's construction of this term.

Accordingly, based on the '234 Patent's intrinsic evidence:

- *"capable of raising/lowering said mainframe" means capable of directly raising and lowering the mainframe.*

**6.      The "Conveying Mainframe" of Claims 1 and 6 Is the Main Body of the Loading/Unloading System that Conveys the Livestock Between the First End of the Base and the Telescopic Conveying Belt Section.**

Finally, Turkey Scope has requested the Court to construe the term "conveying mainframe."  The "conveying mainframe" should be construed as "the main body of the

---

[10] *See supra* footnote 2.

loading/unloading system that conveys the livestock between the first end of the base and the

telescopic conveying belt section."  The relevant portions of claim 1 are shown as follows:

> a **conveying mainframe** having a first and a second end, *said first end of said mainframe pivotably attached near said first end of said base*;
> a telescopic conveying belt section having a conveyor belt and further having a first end and a second end, *said first end of said telescopic conveying belt section pivotably attached to said second end of said mainframe*, said second end of said telescopic conveying belt section generally capable of extending and retracting said belt from one end of said unit to the other

Thus, the conveying mainframe is pivotably attached to the first end of the base and to the first

end of the telescopic conveying belt section—i.e., it extends between the first end of the base and

the telescopic conveying belt section.

Turkey Scope explains in the specification the purpose of the "conveying mainframe":

> *The main body of the apparatus, mainframe 136*, is located between the head section (148) and the preloader 132. The mainframe belt 137 receives livestock from the preloader belt 133 and conveys them to the head section belt and into to the coops.

(Ex. A to Niederluecke Decl., col. 8, ll. 55-59 (emphasis added).)  Thus, the conveying

mainframe must convey livestock between the first end of the base and the telescopic conveying

belt section.  Jennie-O's proposed construction of "conveying mainframe" is consistent with the

only embodiment of the claimed system disclosed in the '234 Patent.[11]

Accordingly, based on the '234 Patent's intrinsic evidence:

- *"conveying mainframe" means the main body of the loading/unloading system that conveys the livestock between the first end of the base and the telescopic conveying belt section.*

---

[11] *See supra* footnote 2.

## V.     CONCLUSION

For the reasons set forth above, Jennie-O requests this Court adopt Jennie-O's proposed

constructions of the disputed terms.


Dated:  August 8, 2007                         s/ Kurt J. Niederluecke
                                               Kurt Niederluecke (#271597)
                                               Lora Esch Mitchell (#259815)
                                               FREDRIKSON & BYRON, P.A.
                                               200 South Sixth Street, Ste. 4000
                                               Minneapolis, MN 55402
                                               Telephone: (612) 492-7000
                                               Facsimile: (612) 492-7077

                                               Robert M. Riffle
                                               ELIAS, MEGINNES, RIFFLE & SEGHETTI
                                               416 Main Street, Suite 1400
                                               Peoria, Illinois 61602
                                               Telephone: (309) 637-6000
                                               Facsimile: (309) 637-8514

                                               ATTORNEYS FOR DEFENDANT
                                               JENNIE-O TURKEY STORE, INC.


4228505

## **COMPLIANCE CERTIFICATION**

Pursuant to LR 7.1(B)(4)(c), I certify that this brief complies with the type volume limitation of LR 7.1(B)(4)(b)(1).  The length of this brief is 6,920 words and 37,034 characters. This brief was prepared using Microsoft Word 2003, and the word processing program has been applied specifically to include all text, including headings, footnotes, and quotations for word count purposes.

Dated:  August 8, 2007

                     s/ Kurt J. Niederluecke              
Kurt Niederluecke (#271597)
Lora Esch Mitchell (#259815)
Molly O'Brien Loussaert (#321230)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Ste. 4000
Minneapolis, MN 55402
Telephone: (612) 492-7000
Facsimile: (612) 492-7077

Robert M. Riffle
ELIAS, MEGINNES, RIFFLE & SEGHETTI
416 Main Street, Suite 1400
Peoria, Illinois 61602
Telephone: (309) 637-6000
Facsimile: (309) 637-8514

ATTORNEYS FOR DEFENDANT
JENNIE-O TURKEY STORE, INC.